**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Jodi A. Schwendimann, f/k/a
Jodi A. Dalvey,

      Plaintiff,

  v.

Arkwright Advanced Coating, Inc.,

      Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 11-820 ADM/JSM

_____

Arkwright Advanced Coating, Inc.,

      Counterclaim Plaintiff,

  v.

Jodi A. Schwendimann, f/k/a
Jodi A. Dalvey, and
Cooler Concepts, Inc.,

      Counterclaim Defendants.

_____

David A. Davenport, Esq., Brent A. Lorentz, Esq., and Daniel J. Kelly, Esq., Winthrop & Weinstine, P.A., Minneapolis, MN, on behalf of Jodi A. Schwendimann and Cooler Concepts, Inc.

Kurt J. Niederluecke, Esq., and Laura L. Myers, Esq., Fredrikson & Byron, P.A., Minneapolis, MN, on behalf of Arkwright Advanced Coating, Inc.

_____

## I. INTRODUCTION

On February 22, 2012, the undersigned United States District Judge heard oral argument

1

on Defendant and Counterclaim Plaintiff Arkwright Advanced Coating, Inc.'s ("AACI") Motion to Dismiss Schwendimann's Patent Infringement Claims for Lack of Subject Matter Jurisdiction [Docket No. 47] ("AACI's Motion to Dismiss") and on Plaintiff and Counterclaim Defendant Jodi A. Schwendimann's ("Schwendimann") Motion for Summary Judgment on Standing [Docket No. 51] ("Schwendimann's Motion for Partial Summary Judgment"). For the reasons set forth below AACI's Motion to Dismiss and Schwendimann's Motion for Partial Summary Judgment are both denied.

## II. BACKGROUND

Schwendimann is the proprietor of Cooler Concepts, Inc., a business which manufactures and sells specialty paper products. Compl. [Docket No. 1] ¶ 1. Schwendimann asserts a claim for patent infringement against Defendant AACI alleging AACI has infringed U.S. Patent Nos. RE41,623, 7,749,581, 7,754,042, 7,766,475, 7,771,554, and 7,824,748 (collectively, the "Patents-in-Suit"). Compl. ¶¶ 31–46. Schwendimann additionally seeks declaratory judgment that a patent owned by AACI is invalid. Compl. ¶¶ 47–50. AACI has asserted counterclaims alleging invalidity and unenforceability of the Patents-in-Suit and infringement by Schwendimann of its patent. First Am. Countercl. [Docket No. 33][1] ¶¶ 42–55.

The instant motions address Schwendimann's allegation that she is the owner of the Patents-in-Suit. See Compl. ¶¶ 8–13. The Patents-in-Suit all related to methods for transferring images onto a colored base. Compl. ¶ 15. An application of the Patents-in-Suit is to print an

---

[1] AACI's First Amended Answer and Counterclaim are a single document with separately numbered paragraphs; the first set of numbers corresponds to the Answer, and the second set to the Counterclaim. For ease and clarity, they will be referred to separately as the First Amended Answer and the First Amended Counterclaim, with paragraph number designations made accordingly.

image from a home printer and transfer it to a T-shirt by ironing over the transfer paper.  Compl. ¶ 17.  The Patents-in-Suit all arise from U.S. Patent Application Serial No. 09/541,845 (the "'845 Application").  See Compl. Exs. A, C, D, E, F, G.  The '845 Application was filed by Schwendimann and her co-inventor, Nabil Nasser ("Nasser"), on April 3, 2000.  See Compl. Ex. A at [64].  At the time, Schwendimann and Nasser were employed by an entity known as Advanced Coating Technologies, Inc. ("ACT").  See Decl. of Brent A. Lorentz in Supp. of Mot. for Summ. J. on Standing [Docket No. 21] ("Lorentz Decl.") Ex. D ("Schwendimann Dep.") 8:3–13:20 (stating Schwendimann worked for ACT from 1992 to 2001); Decl. Nabil Nasser [Docket No. 65] ("Nasser Decl.") ¶ 2 (noting Nasser previously served as President and Chairman of ACT, and was its majority owner).  Schwendimann began employment with ACT in a finance position, but eventually became a co-owner.  Schwendimann Dep. 8:5-8, 14:5-7.

At the time the '845 Application was filed, Schwendimann and Nasser assigned all their interests in the application to ACT.  Decl. of Laura L. Myers in Supp. of AACI's Mot. to Dismiss [Docket No. 50] ("Myers Decl.") Ex. B.  In 2001, ACT began experiencing financial difficulties and ceased business operations.  Schwendimann Dep. 13:19-24.  ACT had numerous creditors, including Schwendimann and the State of Wisconsin, among others.  See, e.g., Lorentz Decl. Exs. G, H, I.  In early 2002, due to ACT's financial problems, it became apparent that ACT would no longer be able to maintain the prosecution of its various patent applications.  Nasser Decl. ¶ 5.  ACT advised its patent counsel, Janal Kalis ("Kalis") of the law firm Schwegman, Lundberg & Woessner, P.A. ("SLW"), that it wished to assign all its intellectual

property to Schwendimann. Nasser Decl. ¶ 5. Since 1998, Schwendimann had also employed Kalis and SLW as her counsel. Decl. of Schwegman, Lundberg & Woessner, P.A.[2] [Docket No. 55] ("SLW Decl.") ¶ 5. In June 2002, SLW opened three new client matters for Schwendimann, representing three patent applications, including the '845 Application, that belonged at the time to ACT. SLW Decl. ¶ 15.

On February 3, 2003, Nasser, on behalf of ACT, and Schwendimann executed an assignment from ACT to Schwendimann of U.S. Patent Application Serial No. 09/150,983 (the "'983 Application"), an application distinct from the '845 Application. Myers Decl. Ex. E at JS002295–96. The following day, Kalis recorded the assignment of the '983 Application with the U.S. Patent and Trademark Office ("USPTO"). Id. at JS002292–96. Schwendimann now avers she understood she owned all of ACT's intellectual property as of February 2003. Schwendimann Dep. 111:18-20. However, in March 2003, Kalis sent Schwendimann an email stating:

> I'm just going to throw this idea out for your review only regarding ownership of the image transfer patents and applications. The situation arose because ACT wanted to avoid abandonment of its invention but could not pay the fees. You provided consideration by reviving and prosecuting the applications.
>
> We need to provide consideration back to ACT. One possibility is for you to provide ACT with a license to use the invention . . . . Is ACT in operation or is it shut down?

---

[2] AACI argues the Court should not consider the SLW Declaration because its signor, Albin J. Nelson, lacks personal knowledge of its contents. The declaration will be considered as Nelson was SLW's designated Rule 30(b)(6) representative. See Sunbelt Worksite Mktg., Inc. v. Metro. Life Ins. Co., No. 8:09-cv-02188, 2011 WL 3444256, at *2 (M.D. Fla. Aug. 8, 2011).

> Do you know how many lienholders there are?
>
> I am still working on researching case law regarding ownership transfer of an abandoned application. I did not do this earlier because . . . . I thought it would be safer to revive and work out ownership rather than lose all rights . . . .

Decl. of Kurt J. Niederluecke in Supp. of AACI's Opp. to Schwendimann's Mot. for Summ. J. on Standing [Docket No. 69] ("Niederluecke Decl.") Ex. 6. The next day Kalis sent Schwendimann another email asking "whether other ACT lien holders took their liens when after [sic] the patent applications went abandoned?" Niederluecke Decl. Ex. 7.

On April 16, 2003, the USPTO issued a rejection of the '845 Application and required a shortened statutory period of three months for a response. In May 2003, Kalis sent a SLW paralegal, Candy Buending ("Buending"), an email inquiring whether the '845 Application "was covered in one of the assignments from [ACT] to [Schwendimann]" and whether Schwendimann had an ownership in the application. Niederluecke Decl. Ex. 9. Around this time, SLW prepared a draft assignment of the '845 Application, but the draft was never executed. SLW Decl. ¶ 19, Ex. H.

On November 25, 2003, the USPTO issued a final office action rejecting or objecting to claims in the '845 Application, and provided a shortened three-month statutory period for a response. Niederluecke Decl. Ex. 10. On December 3, 2003, Kalis sent Buending another email stating: "We need to make sure that the assignments filed assigning patents from ACT cover this application as well as the application with the Ex Parte Quale action. THIS IS VERY IMPORTANT. IF NOT, WE NEED TO FIX ASAP, PLEASE LET ME KNOW THE STATUS

ASAP!!" Niederluecke Decl. Ex. 11 (emphasis in original).

The next day, December 4, 2003, Kalis sent a facsimile to the USPTO. Niederluecke Decl. Ex. 14. It included a cover sheet identifying the contents as an assignment of the '845 Application from ACT to Schwendimann. Id. at SLW00015–17. Appended to the cover sheet was a photocopy of the assignment of the '983 Application, sent to the USPTO in February 2003, with a minor alteration. See id. at SLW00018–19. The original '983 Application document had 1010.015 USI hand-written in the upper-right hand corner, which represented the client and matter number SLW associated with Schwendimann and the '983 Application. See Myers Decl. Ex. E at JS002295 (assignment of '983 Application with hand-written 1010.015 USI visible in upper right-hand corner); SLW Decl. ¶ 15a (noting 1010.015 was client and matter number SLW associated with Schwendimann and the '983 Application). The document sent to the USPTO, however, had the .015 portion of the identification number crossed-out by hand, and replaced by a hand-written .021. Niederluecke Decl. Ex. 14 at SLW00018. The client and matter number SLW used for Schwendimann and the '845 Application was 1010.021 USI. SLW Decl. ¶ 15b. A few minutes later Kalis sent another facsimile with a cover sheet identifying the contents as the assignment of another patent application. Niederluecke Decl. Ex. 15 at SLW00107–09. Appended to the cover sheet was another photocopy of the assignment of the '983 Application with the client and matter numbers changed by hand to reflect the patent application identified in the cover sheet. Niederluecke Decl. Ex. 15 at SLW00110–11.

Subsequently, Kalis pursued the '845 Application on behalf of Schwendimann. See, e.g.,

Niederluecke Decl. Exs. 17, 18, Ultimately, the Patents-in-Suit issued and, after some procedural maneuvering between the parties here,[3] this lawsuit ensued. On July 18, 2011, after some investigation into the Patents-in-Suit's chain of title, AACI amended its Answer to assert an affirmative defense premised on Schwendimann's alleged lack of ownership. See First Am. Answer at 6. In September 2011, a new document was executed, assigning from ACT[4] to Schwendimann certain intellectual property, including that resulting from the '845 Application. Myers Decl. Ex. H. On December 8, 2011, Magistrate Judge Janie S. Mayeron issued an Order [Docket No. 44] allowing additional discovery limited to patent ownership issues. Prior to Judge Mayeron's order, AACI stated during a telephone conference a desire to depose Nasser. Niederluecke Decl. ¶ 22. However, several attempts by AACI to serve Nasser at locations in two states proved unsuccessful. See Niederluecke Decl. Ex. 24. Nasser continues to do consulting work for Schwendimann, often within Minnesota. Niederluecke Decl. Ex. 1 51:10–52:21. Yet, to date the only participation he has had in this case is to file a declaration in support of Schwendimann's present motion. See generally Nasser Decl.

### III. DISCUSSION

**A.  Standard of Review**

The present motions raise the issue of standing. Standing is "an essential and unchanging part of the case-or-controversy requirement of Article III" of the U.S. Constitution. Lujan v.

---

[3] The Court's prior Order [Docket No. 40] dated September 8, 2011 includes a more detailed overview of the procedural history of the controversy between these parties.
[4] ACT was administratively dissolved by the State of Wisconsin in 2009. Myers Decl. Ex. I. At oral argument, the parties agreed that the September 2011 assignment does not bear on the present motions, and therefore the effect of ACT's dissolution need not be considered.

Defenders of Wildlife, 504 U.S. 555, 560 (1992) (citation omitted). "The party invoking federal jurisdiction bears the burden of establishing [standing]." Id. at 561 (citations omitted). "A court may exercise jurisdiction only if a plaintiff has standing to sue on the date it files suit." Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1364 (Fed. Cir. 2010). "Only a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit . . . ." Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1367 (Fed. Cir. 2008) (citation omitted). Subject matter jurisdiction is a question of law. DDB Technologies, L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284 (Fed. Cir. 2008). Therefore, facts related to standing issues are resolved by the Court. See id. at 1290–92 (holding there is no right to a jury trial on standing issues related to contract construction in patent infringement action because standing was not sufficiently intertwined with merits of the claims).

AACI's Motion to Dismiss, premised on lack of standing, is made under Rule 12(b)(1) of the Federal Rules of Civil Procedure (the "FRCP"). A motion to dismiss for lack of subject matter jurisdiction may challenge the complaint either on its face or on the factual truthfulness of its averments. See Titus v. Sullivan, 4 F.3d 590, 593 (8th Cir. 1993); Osborn v. United States, 918 F.2d 724, 729 n.6 (8th Cir. 1990). AACI attacks the factual truthfulness of Schwendimann's allegation that she is the owner of the Patents-in-Suit. Therefore, Schwendimann does not receive the benefits of Rule 12(b)(6)–namely to have only the pleadings considered and to have them construed in her favor. See Osborn, 918 F.3d at 729 n.6. Rather, the Court may consider matters outside the pleadings. Id. (citing Menchaca v. Chrysler Credit Corp., 613 F.3d 507, 511 (5th Cir. 1980)).

Schwendimann's Motion for Partial Summary Judgment is made under Rule 56 of the FRCP. Under Rule 56(a), a "party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id.

**B.     Writing Requirement**

Schwendimann asserts she has standing as the assignee of the '845 Application and the resulting Patents-in-Suit. Patents and patent applications are assignable only by an instrument in writing. 35 U.S.C. § 261. This writing requirement imposes no form or contents requirements. See Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc., No. CV-03-0597-PHX-MHM, 2009 WL 886514, at *7 (noting that § 261 "imposes no limitations as to the form or content" of the writing). Rather, an "assignment of a patent is interpreted in accordance with statutory and common law of contract . . . ." Tri-Star Elecs. Int'l, Inc. v. Preci-Dip Durtal SA, 619 F.3d 1364, 1367 (Fed. Cir. 2010). AACI argues that the underlying validity of any assignment contract between ACT and Schwendimann need not be reached because no written instrument exists memorializing such an assignment. For her part, Schwendimann avers the documents submitted to the USPTO are a written instrument memorializing an agreement of the parties, and any facial deficiencies, such as the references to the '983 Application rather than the '845 Application, are the result of a mutual mistake or scrivener's error that should be reformed by the Court through an exercise of its equitable authority.

9

The entire set of documents submitted by Kalis cannot together form the "instrument in writing" because the cover sheets are facially both distinct from its attachments and not an agreement of any kind, much less an assignment, between ACT and Schwendimann. Cf. Telepresence Techs., LLC v. Upper Deck Co., 2001 WL 36239744, at *2 (C.D. Cal. Mar. 29, 2011) (declining to consider cover sheet in construing execution date of assignment in light of notarized execution date on contract itself). Therefore, the Court must next consider whether the document that is a photocopy of the '983 Application with the hand-written alteration (the "purported assignment") is a writing memorializing a valid assignment contract. Because there are no form or content requirements for what constitutes an "instrument in writing" under 35 U.S.C. § 261, the purported assignment is a sufficient writing if an underlying valid contract amenable to reformation exists under Minnesota law[5] between ACT and Schwendimann. To be sure, the purported assignment has a number of irregularities on its face; however, AACI has identified no authority, and the Court finds none, that any of these irregularities preclude the finding of a written instrument under 35 U.S.C. § 261.

For instance, the lack of any "wet-ink" signature on the document could be characterized as irregular or unusual. Nonetheless, the lack of a "wet-ink" signature is not dispositive for two reasons. First, it is not established that the document lacks the signature of either Schwendimann or Nasser, on behalf of ACT. Generally, a signature is any symbol executed or adopted with a present intention to adopt or accept a writing. See Minn. Stat. § 336.1-201(37); see also

---

[5] Since neither party advocates for a particular choice of law analysis, the parties implicitly agree that Minnesota law applies to determine the validity of any assignment contract.

10

Restatement (Second) of Contracts § 134 (1981). A signature need not be hand-written. See, e.g., Simplex Supplies, Inc. v. Abhe & Svoboda, Inc., 586 N.W.2d 797, 802 (Minn. Ct. App. 1998) (holding typewritten signature sufficient to satisfy Minnesota's Statute of Frauds). Generally, an agent may sign a writing for its principal, and both parties to a contract may be bound by a mutual agent. See, e.g., Miller-Crenshaw Co. v. Colorado Mill & Elevator Co., 87 F.3d 457, 460 (8th Cir. 1937) (holding typewritten signature of buyer, typed by broker, was sufficient to satisfy Arkansas's Statute of Frauds); see also Restatement (Second) of Agency § 30 (1958). Therefore, if Kalis reproduced ACT's and Schwendimann's signatures, as an agent of both, with the authority and intent to bind them to an assignment contract, the signatures may be valid.

Second, regardless of whether the document is or is not signed, as a matter of general contract law, a signature is not required to make a writing enforceable. See, e.g., Operating Eng'rs Local 139 Health Benefit Fund v. Gustafson Constr. Corp., 258 F.3d 645, 649 (7th Cir. 2001) ("[I]f [a contract] is in writing, it needn't be signed, provided there's other evidence of acceptance . . . .") (citation omitted); First Nat'l Bank of Sleepy Eye, Minn. v. Sleeper, 12 F.2d 228, 230 (8th Cir. 1926) ("A contract may be made by accepting a writing containing the terms of the proposed contract, although the one accepting it does not sign it."); Welsh v. Barnes-Duluth Shipbuilding Co., 21 N.W.2d 43, 46–47 (Minn. 1945) (noting "contract may be binding on a party even though not signed by him" because signature is used to show assent, which may be established through other means). Therefore, even without a signature, the document could still be a written instrument under federal law.

11

Similarly, while the form of this purported assignment contract, a photocopy of a different contract with a minor hand-written alteration, could be characterized as irregular, the form does not preclude a finding of a written instrument. Attorneys often re-use language from one contract to the next. Indeed, "boilerplate" contracts–contracts with a identical terms that a party uses for similar transactions–are not repugnant to the law absent special circumstances. See, e.g., Hauenstein & Bermeister, Inc. v. Met-Fab Indus., Inc., 320 N.W.2d 886, 891 (Minn. 1982) (upholding forum selection clause in contract notwithstanding fact it was "boilerplate" language). If Kalis had not merely altered the client and matter number in the upper right hand corner of the purported assignment but also altered the patent application number, little would distinguish this case from any other involving form or "boilerplate" contracts. The form of the purported assignment does not preclude a finding of a written instrument.

The relevant inquiry is solely whether the purported assignment is a writing. Without any express statutory definition, what is meant by an "instrument in writing" must be determined in reference to its ordinary meaning. Asgrow Seed Co. v. Winterboer, 513 U.S. 179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning.") (citation omitted). The ordinary meaning of writing is an intentional reduction to tangible form. Minn. Stat. § 336.1-201(43) ("'Writing' includes printing, typewriting, or any other intentional reduction to tangible form."); Restatement (Second) of Contracts § 131, cmt. (d) ("Writing . . . includes any intentional reduction to tangible form) (citing U.C.C. § 1-201); see also Black's Law Dictionary 1748 (9th ed.) (defining "writing" as "[a]ny intentional recording of words that may be viewed or heard with or without mechanical aids"). Here, the purported assignment is in

a tangible form—it is a written document.  Furthermore, because the purported assignment includes the hand-written alterations, it suggests the purported assignment was an intentional reduction (whether or not it was a reduction of a valid contract will be addressed below) rather than an unintentional reproduction of the '983 Application .  Therefore, the purported assignment is an instrument in writing.

The writing requirement, however, is not the end of the inquiry.  For Schwendimann to have standing, she must be the owner of the '845 Application, which is determined by state law.  See Enovsys LLC v. Nextel Commc'ns, Inc., 614 F.3d 1333, 1342 (Fed. Cir. 2010) ("Who has legal title to a patent is a question of state law.").

**C.     Validity of Underlying Assignment**

On its face, the purported assignment conveys  to Schwendimann rights in the '984 Application, not the '845 Application.  In Minnesota, absent ambiguity, contract terms are given their plain and ordinary meaning.  Knudsen v. Transp. Leasing/Contract, Inc., 672 N.W.2d 221, 223 (Minn. Ct. App. 2003).  Furthermore, extrinsic evidence may not be used to vary the terms of an unambiguous written agreement.  Alpha Real Estate Co. of Rochester v. Delta Dental Plan of Minn., 664 N.W.2d 303, 312 (Minn. 2003).  However, under Minnesota law,

> A written instrument can be reformed by a court if the following elements are proved: (1) there was a valid agreement between the parties expressing their real intentions; (2) the written instrument failed to express the real intentions of the parties; and (3) this failure was due to a mutual mistake of the parties, or a unilateral mistake accompanied by fraud or inequitable conduct by the other party.

Nichols v. Shelard Nat'l Bank, 294 N.W.2d 730, 734 (Minn. 1980) (citations omitted).  Contract

reformation is an equitable remedy. See Fritz v. Fritz, 102 N.W. 705, 706 (Minn. 1905).[6]

Schwendimann argues her real intention, and that of ACT, was to assign the '845 Application, and the Court should reform the purported assignment to reflect those intentions. At this procedural stage, Schwendimann's argument is unavailing. Reformation requires more than intentions, it requires a *valid agreement*. Nichols, 294 N.W.2d at 734 (emphasis added). Under Minnesota law, a contract is formed when there is "mutual assent" of the parties. Field-Martin Co. v. Fruen Milling Co., 298 N.W. 574, 575 (Minn. 1941). "Mutual assent entails a meeting of the minds concerning a contract's essential elements." SCI Minn. Funeral Servs., Inc. v. Washburn-McReavy Funeral Corp., 795 N.W.2d 855, 864 (Minn. 2011) (quoting Minneapolis Cablesystems v. City of Minneapolis, 299 N.W.2d 121, 122 (Minn. 1980)). "The formation of a contract requires communication of a specific and definite offer, acceptance, and consideration." Thomas B. Olson & Assocs., P.A. v. Leffert, Jay & Polglaze, P.A., 756 N.W.2d 907, 918 (Minn. Ct. App. 2008) (quoting Commercial Assocs., Inc. v. Work Connection, Inc., 712 N.W.2d 772, 782 (Minn. Ct. App. 2006)).

Mutual assent is critical here because a valid contract can arise from ACT and Schwendimann's stated intentions only with mutual assent to the essential elements of the alleged assignment—without mutual assent to the essential elements, ACT and Schwendimann's

---

[6] AACI contends, without citing authority, that ACT could not assign its intellectual property because all its property was subject to security interests in favor of its many creditors. Under Minnesota law, however, a security interest in collateral will continue notwithstanding sale of the collateral. Border State Bank, N.A. v. AgCountry Farm Credit Servs., 535 F.3d 779, 782 (8th Cir. 2008). Therefore, AACI's argument is rejected absent authority that the consent of a secured party is required.

intention to assign intellectual property is merely an agreement to assign in the future, which does not confer standing under federal law and does not form a valid contract under Minnesota law.  See Mohrenweiser v. Blomer, 573 N.W.2d 704, 707 (Minn. Ct. App. 1998) (holding "letter of agreement" signed by parties was "an unenforceable agreement to agree in the future"); compare Gaia Techs., Inc. v. Reconversion Techs., Inc., 93 F.3d 774, 779 (Fed. Cir. 1996) (noting minutes from meeting of company's board of directors evinced only an agreement to assign, not an assignment that vested legal title in plaintiff) with Southwest eFuel Network, L.L.C. v. Transaction Tracking Techs., Inc., 2:07-cv-311, 2009 WL 4730464, at *3–4 (E.D. Tex. Dec. 7, 2009) (holding plaintiff had standing despite clerical error in assignment contract).

On the present record, the Court cannot determine whether a valid agreement to assign the '845 Application exists.  Schwendimann has advanced no legal theories, nor offered any supporting evidence, to support a finding of the existence of an offer, acceptance, or consideration.  The precise terms of the alleged assignment of the '845 Application, for example what consideration Schwendimann provided to ACT, remain unknown.

The sole evidence offered by Schwendimann to support the existence of an agreement between her and ACT is Nasser's statement that "ACT intended to transfer all of its intellectual property to [Schwendimann] many years ago and I have always believed that it did so . . . ." Nasser Decl. ¶ 7.  This statement is deficient in several respects.  First, its lack of specificity as to the terms of the assignment of the '845 Application, if any, make it impossible to determine whether ACT's intent to transfer the '845 Application was an agreement to assign in the future

or an actual present assignment. Second, an issue of fact remains whether Nasser is competent to testify as to ACT's intentions in the relevant time period. He states that he previously served as President and Chairman of ACT. Nasser Decl. ¶ 1. Yet, in July 2000, Schwendimann represented to the State of Wisconsin that she was the President and sole director of ACT. Niederluecke Decl. Ex. 25.

Finally, Nasser's statement is hearsay. Normally, summary judgment may be based on affidavits and declarations that, while technically hearsay, are submitted under Rule 56 of the FRCP. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (stating that nonmoving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment"); see also Fed. R. Civ. P. 56(c). Rule 56(c), however, includes an important qualification of the Rule. Affidavits or declarations must "show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). On that basis, courts have held that summary judgment may not be based on statements of an affiant or declarant who will be unavailable to testify at trial due to the rules against hearsay. See J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990) (considering evidence in affidavit on summary judgment where contents could later be presented through direct testimony and there was no indication affiant would be unavailable to testify at trial); Murphy v. County of Yavapai, CV-04-1861, 2006 WL 2460916, at *5 (D. Ariz. Aug. 23, 2006) (striking affidavit and reports of witnesses as hearsay where witness would be unavailable at trial); Bortell v. Eli Lilly & Co., 406 F. Supp. 2d 1, 11–12 (D.D.C. 2005) (noting that on summary judgment courts may consider

evidence in non-admissible form only when the contents will be "reduced to admissible form at trial" and declining to consider affidavits of unavailable witnesses). Here, it is unclear whether Nasser would be available or unavailable were the Court to convene an evidentiary hearing on standing. Thus far, AACI has been unable to contact Nasser, and several attempts to serve him with a subpoena have proved unsuccessful. See Niederluecke Decl. Ex. 24. Schwendimann, despite an ongoing business relationship with Nasser, has evinced a desire not produce him as a witness on her behalf. See id. Of course, Schwendimann may choose the manner of meeting her burden of establishing subject matter jurisdiction. Nonetheless, apart from Nasser's deficient and vague statements, Schwendimann has offered no evidence from which to infer mutual assent to an assignment of the '845 Application.

Given the inadequate state of the record and the Court's duty to investigate its own subject matter jurisdiction, rather than grant AACI's Motion to Dismiss, both motions are denied without prejudice. At oral argument, the parties stated many of the evidentiary issues discussed above are the subject of an upcoming motion hearing before Magistrate Judge Janie S. Mayeron. Therefore, this Court will defer to Judge Mayeron to establish the precise contours of further factual development—whether it comes as an evidentiary hearing, additional depositions, or another form. The parties may later renew their motions subject to any scheduling set by Judge Mayeron.

## IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS**

**HEREBY ORDERED** that AACI's Motion to Dismiss [Docket No. 47] is **DENIED** and Schwendimann's Motion for Partial Summary Judgment [Docket No. 51] is **DENIED**.

                                        BY THE COURT:

                                        <u>     s/Ann D. Montgomery     </u>
                                        ANN D. MONTGOMERY
                                        U.S. DISTRICT JUDGE

Dated:  March 19, 2012.