# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

JODI A. SCHWENDIMANN, f/k/a JODI
A. DALVEY

　　　　　　　　　　　　Plaintiff,

v.

ARKWRIGHT ADVANCED COATING,
INC.

　　　　　　　　　　　　Defendant.

ARKWRIGHT ADVANCED COATING,
INC.

　　　　　　　　　　Counterclaim Plaintiff,

v.

JODI A. SCHWENDIMANN, f/k/a JODI
A. DALVEY and COOLER CONCEPTS,
INC.

　　　　　　　　Counterclaim Defendants.

Civil No.  11-820 (JRT/HB)

**MEMORANDUM OPINION AND
ORDER**

David A. Davenport, Devan V. Padmanabhan, and Michelle E. Dawson,
**WINTHROP & WEINSTINE, PA**, 225 South Sixth Street, Suite 3500,
Minneapolis, MN  55402, for Jodi A. Schwendimann and Cooler Concepts,
Inc.

Katherine J. Rahlin, Kurt J. Niederluecke, and Laura L. Myers,
**FREDRIKSON & BYRON, PA**, 200 South Sixth Street, Suite 4000,
Minneapolis, MN  55402, for Arkwright Advanced Coating, Inc.

Plaintiff Jodi Schwendimann brought this patent-infringement action against Arkwright Advanced Coating, Inc. ("AACI"), for infringement of a number of patents related to dark T-shirt transfer technology.  AACI brought a counterclaim for infringement of U.S. Patent 6,667,093 ("the '093 Patent"), which the jury subsequently found invalid.  AACI renews its Motion for Judgment as a Matter of Law on the invalidity of the '093 Patent.  In the alternative, AACI moves for a new trial on this issue.  The Court will deny both of AACI's motions.

## BACKGROUND

AACI brought a counterclaim of patent infringement against Schwendimann and her company, Cooler Concepts, Inc., alleging infringement of the '093 Patent.  (AACI's Answer to Am. Compl. ("Answer") at 12-23, June 8, 2015, Docket No. 268.)  Claim 1 of the '093 Patent provides:

> An ink-jet printable transfer paper for transferring an image to a fabric material, comprising a support paper having a surface coated with:
> a hot-melt layer comprising a thermoplastic polymer having a melting point in the range of 60° to 180° C.,
> a substantially opaque layer (a) comprising a polyurethane binder and inorganic white pigment, and
> ink-receptive layer (b) comprising a polyurethane binder and organic  polymeric particles.

(Decl. of Laura Myers ("Myers Decl.") ¶ 31, Nov. 20, 2017, Docket No. 746; Trial Ex. P025 ('093 Patent) at 10:54-62, Nov. 20, 2017, Docket No. 751.)  Claim 11 of the '093 Patent provides:

An ink-jet printable transfer paper for transferring an image to a fabric material, comprising a support paper having a surface coated with:

a) a first layer comprising silicone,

b) a hot-melt second layer comprising a thermoplastic polymer having a melting point in the range of 60° to 180° C., said second layer overlaying the first layer,

c) a substantially opaque third layer comprising a polyurethane binder and inorganic white pigment, said third layer overlaying said second layer, and

d) an ink-receptive fourth layer comprising a polyurethane binder and organic particles, said fourth layer overlaying said third layer.

('093 Patent at 11:26-39.)

Before trial, the Court granted AACI summary judgment of infringement of the '093 Patent. (Mem. Op. & Order at 12-15, Dec. 12, 2016, Docket No. 439.) Subsequently, AACI filed motions in limine asking that the Court exclude evidence of (1) Schwendimann's '845 Application and '475 Patent, and (2) alleged copying of Schwendimann's invention by Arkwright. (Mem. Op. & Order ("MILs Order") at 12-14, Sept. 25, 2017, Docket No. 598.) The Court denied these motions. (*Id.*)

At the close of Schwendimann's case-in-chief, AACI moved for judgment as a matter of law that the '093 Patent is not invalid. (AACI's Mot. for J. as a Matter of L., Oct. 13, 2017, Docket No. 637.) The Court denied this motion. (Trial Tr. Vol. IX at 2043:17-22, Nov. 27, 2017, Docket No. 768.)

The Court instructed the jury that Schwendimann must prove invalidity of the '093 Patent by clear and convincing evidence. (Jury Inst. at 31, Oct. 17, 2017, Docket No. 780.) The jury returned a verdict in Schwendimann's favor and found claims 1 and 11 of the '093 Patent invalid as anticipated by (1) Schwendimann's '475 Patent in light of the '845

Application and (2) Schwendimann's products. (Am. J., Nov. 14, 2017, Docket No. 705; Redacted Verdict at 3, Oct. 20, 2017, Docket No. 678.)

AACI renews its motion for judgment as a matter of law on invalidity of the '093 Patent. (Def.'s Renewed Mot. for J. as a Matter of L. on Invalidity of the '093 Patent ("Invalidity JMOL"), Docket No. 737.) In the alternative, AACI moves for a new trial on the same issue. (*Id.*)

## DISCUSSION

## I.      STANDARD OF REVIEW

### A.      Post-Trial Motions

While Federal Circuit law governs substantive patent law, regional circuit law governs a district court's rulings on post-trial motions for judgment as a matter of law and for a new trial. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1202 (Fed. Cir. 2010).

Under Rule 50(a)(1) of the Federal Rules of Civil Procedure, the Court may resolve an issue as a matter of law if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." A party may renew a motion for judgment as a matter of law after trial. Fed. R. Civ. P. 50(b). "A motion for judgment as a matter of law should be granted when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the nonmoving party." *Hunt ex rel. Hunt v. Lincoln Cty. Mem'l Hosp.*, 317 F.3d 891, 893 (8th Cir. 2003) (quoting *Neely v. Am.*

*Family Mut. Ins. Co.*, 123 F.3d 1127, 1129 (8th Cir. 1997)).  In making this determination, the Court must

> consider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that could be drawn from the evidence.

*Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 301 (8th Cir. 1991) (quoting *Atlas Pile Driving Co. v. Dicon Fin. Co.*, 886 F.2d 986, 989 (8th Cir. 1989)).

The Court may grant a motion for a new trial "on all or some of the issues."  Fed. R. Civ. P. 59(a)(1).  "A new trial is appropriate when the first trial, through a verdict against the weight of the evidence . . . or legal errors at trial, resulted in a miscarriage of justice." *Gray v. Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996).  "The authority to grant a new trial is within the discretion of the district court."  *Id.*  The Court may grant a new trial where erroneous evidentiary rulings "had a substantial influence on the jury's verdict."  *Littleton v. McNeely*, 562 F.3d 880, 888 (8th Cir. 2009) (quoting *Harris v. Chand*, 506 F.3d 1135, 1139 (8th Cir. 2007)).  Furthermore, only if the jury's verdict is "so against the great weight of the evidence" that it "constitute[s] a miscarriage of justice" should a motion for a new trial be granted.  *Ogden v. Wax Works, Inc.*, 214 F.3d 999, 1010 (8th Cir. 2000).

### B.    Invalidity

An issued patent is presumed valid.  35 U.S.C. § 282.  The party asserting invalidity bears the burden of proving invalidity by clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

A patent is invalid if its claims are anticipated by prior art.  Three methods of anticipation are relevant in this case.

First, a patent is anticipated under 35 U.S.C. § 102(a)[1] if the claimed invention "was known or used by others in this country."  "For prior art to anticipate under 35 U.S.C. § 102(a) because it is 'known,' the knowledge must be publicly accessible, and it must be sufficient to enable one with ordinary skill in the art to practice the invention."  *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002) (citation omitted).

Second, a patent is anticipated under 35 U.S.C. § 102(b) if the claimed invention was "on sale . . . more than one year prior to the date of the application for patent."  The on-sale bar applies when the claimed invention was the subject of a commercial offer for sale and was ready for patenting.  *Medicines Co. v. Hospira, Inc.*, 827 F.3d 1363, 1372-73 (Fed. Cir. 2016).  A commercial offer for sale is an offer that another party could make into a binding contract by acceptance.  *Id.* at 1378.  The on-sale bar applies even when the

---

[1] The pre-AIA versions of the Patent Act apply here.  *See generally In re Nuvasive, Inc.*, 842 F.3d 1376, 1380 n.3, 1381 n.4 (Fed. Cir. 2016).

patentee's offer is kept secret. *Woodland Tr. v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1370-71 (Fed. Cir. 1998); *see Medicines*, 827 F.3d at 1376.

Third and finally, a patent is anticipated under 35 U.S.C. § 102(e) if the claimed invention was described in "(1) an application for patent, published under section 122(b), by another filed . . . before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed . . . before the invention by the applicant for patent."

An invalidity finding requires corroboration of oral testimony:

> Oral testimony by an interested party on its own will generally not suffice as "clear and convincing" evidence of invalidity. Rather, such oral testimony must be corroborated by some other evidence. **The corroborating evidence can include documents and testimonial evidence.** Circumstantial evidence can be sufficient. This corroboration requirement for testimony by an interested party is based on the sometimes unreliable nature of oral testimony, due to "the forgetfulness of witnesses, their liability to mistakes, their proneness to recollect things as the party calling them would have them recollect, aside from the temptation to actual perjury."

*Transweb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1301 (Fed. Cir. 2016) (emphasis added) (quoting *Lazare Kaplan Int'l v. Photoscribe Techs.*, 628 F.3d 1359, 1374 (Fed. Cir 2010)) (citations omitted). Whether oral testimony is sufficiently corroborated is governed by a "rule of reason," whereby "all pertinent evidence is examined in order to determine whether the inventor's story is credible." *Id.* (quoting *Sandt Tech. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1350 (Fed. Cir. 2001); *Woodland Tr.*, 148 F.3d at 1371. "Importantly, this analysis 'does not require that every detail of the testimony be independently and conclusively supported' by the corroborating evidence." *Transweb*, 812

F.3d at 1301-02 (quoting *Ohio Willow Wood Co. v. Alps South*, 735 F.3d 1333, 1348 (Fed. Cir. 2013)).

## II.     JUDGMENT AS A MATTER OF LAW

The Court must decide whether to grant AACI judgment as a matter of law on the issue of invalidity of the '093 Patent.   AACI argues that neither the '475 Patent nor Schwendimann's products disclose polyurethane in each of the white and/or ink-receptive layers.  (AACI's Mem. Supp. Invalidity JMOL at 3-4, Nov. 20, 2017, Docket No. 739.)

### A.     Schwendimann's 1990s Invention

The Court must decide whether the jury could have reasonably found by clear and convincing evidence that the '093 Patent is anticipated by Schwendimann's 1990s invention.  (*See* Trial Tr. Vol. I at 21:2-8, Nov. 27, 2017, Docket No. 760.)  The Court's analysis involves three questions: (1) whether Schwendimann's invention in the mid-1990s included an ink-receiving layer and a white layer, both of which contained polyurethane, AND (2) whether Schwendimann's invention was on sale more than one year before April 19, 2011, the filing of the application resulting in the '093 Patent, OR (3) whether Schwendimann's invention was publicly known or used by others before April 19, 2001. The Court will conclude that sufficient evidence supports the jury's finding that Schwendimann's invention anticipates the '093 Patent because Schwendimann's invention was on sale one year before April 19, 2011 and was publicly known before April 19, 2001.

### 1. Ink-Receiving and White Layers

First, the Court must decide whether Schwendimann's 1990s invention included an ink-receiving layer and a white layer, both containing polyurethane. The Court finds the following testimonial and documentary evidence relevant to its determination: (1) Schwendimann's testimony, (2) Bill Nasser's testimony, (3) Mike Galatowitsch's testimony, and (4) Schwendimann's formula book.

### a. Schwendimann's Testimony

Schwendimann testified that she began working with Bill Nasser – the owner of American Coating Technologies ("ACT") – in 1992. (Trial Tr. Vol. II at 91:2-20, Nov. 27, 2017, Docket No. 761.) She testified that they developed light T-shirt transfer products between 1993 and 1994, and ACT began selling these products in 1996. (*Id.* at 97:16-98:16.) Schwendimann explained – using demonstratives – that the light T-shirt transfer products do not properly display the image on colored shirts. (*Id.* at 101:13-102:13.)

As a solution, Schwendimann testified that she, Nasser, and Mike Galatowitsch began developing dark T-shirt transfer products in 1995, and ACT began selling these products in 1999. (*Id.* at 99:2-101:12; 110:18-23.) She explained that her role was to conceptualize the dark T-shirt transfer product and explain to the chemist how she expected the customer to use it. (*Id.* at 110:18-111:11.) Schwendimann explained that the dark T-shirt transfer products used many of the same components as the light T-shirt transfer products, specifically (1) the ink-receiving layer, (2) the release layer, (3) the base paper substrate, and (4) the resin layer. (*Id.* at 111:23-112:5.) She testified that the ink-receiving layer used in both products included polyurethane. (*Id.* at 112:15-18; 120:8-15; 123:18-

21.)  Additionally, Schwendimann testified that they included a white layer comprising titanium and polyurethane to ensure that the image would show on colored fabrics.  (*Id.* at 102:5-8; 116:18-23; 121:20-123:21; 126:15-17.)

Based on Schwendimann's testimony, a reasonable jury could have found that Schwendimann invented a dark T-shirt transfer product around 1996 that contained both (1) an ink-receiving layer containing polyurethane and (2) a white layer containing polyurethane.

However, Schwendimann's testimony must be further corroborated by uninterested witnesses or documentary evidence because she invented the dark T-shirt transfer product that is claimed as prior art.  *See Finnigan Corp. v. ITC*, 180 F.3d 1354, 1367-68 (Fed. Cir. 1999).

### b.     Nasser's Testimony

Nasser testified that he was the owner of ACT from the mid-1980s until it closed in 2001.  (Trial Tr. Vol. III at 359:4-364:16, Nov. 27, 2017, Docket No. 762.)  Nasser testified that in 1995 ACT developed a light T-shirt transfer product that contained a release layer, a hot-melt layer, and an ink-receiving layer.  (*Id.* at 369:18-370:3.)  He testified that the ink-receiving layer incorporated polyurethane.  (*Id.* at 370:4-17.)  Nasser explained that polyurethane "helped absorb the ink to make it dry faster" and "would allow [the image] to be able to stretch and be able to be soft."  (*Id.*)

Nasser also testified that ACT developed – with the help of Schwendimann and Galatowitsch – a dark T-shirt transfer product around 1996 because the light T-shirt transfer product did not work with colored fabrics.  (*Id.* at 372:2-373:14.)  Nasser explained

that his role was to develop the "chemical recipe" for the product. (*Id.* at 372:21-25.) Nasser testified that the chemical composition of the ink-receiving layer in both the light T-Shirt transfer product and the dark T-shirt transfer product was the same because "there was no reason to really change it." (*Id.* at 376:6-16.) He confirmed that the dark T-shirt product's ink-receiving layer contained polyurethane. (*Id.* at 376:17-21.)

Nasser also testified that they "incorporated a white layer in th[e] formulation structure [of the dark T-shirt transfer product] to be able to give us that white background so we'd be able to see a contrast between the print and between the T-shirt structure." (*Id.* at 376:22-377:7.) He explained that it was "critical" that the white layer be elastic and washable to prevent destruction of the image. (*Id.* at 377:8-378:33.) To create a product that was able to stretch, Nasser testified that the white layer comprised titanium dioxide and polyurethane. (*Id.* at 379:2-11, 388:18-390:15.) Nasser testified that they tried samples with chemicals other than polyurethane but these chemicals did not work as well. (*Id.* at 380:16-381:7.) Nasser testified that these samples were made between 1996 and 1997 and could have been sold on the market. (*Id.* at 397:16-22.) Nasser testified that ACT began selling the dark T-shirt transfer product in 1999. (*Id.* at 374:14-18.)

Based on Nasser's testimony, a reasonable jury could have found that Schwendimann invented a dark T-shirt transfer product around 1996 that contained both (1) an ink-receiving layer containing polyurethane and (2) a white layer containing polyurethane.

However, the Court concludes that Nasser's testimony must be further corroborated by uninterested witnesses or documentary evidence because he is an interested party. *See*

*Finnigan*, 180 F.3d at 1367-68.  The Court finds that Nasser is an interested party because "[a] witness who testifies to antedating the invention of the patent-in-suit can be expected to derive a sense of professional or personnel accomplishment in being the first in the field, and in this sense is not uninterested in the outcome of the litigation, even if that witness is not claiming entitlement to a patent."  *Id.* at 1368.

### c.  Galatowitsch's Testimony

Galatowitsch testified that he worked at ACT from 1989 until 2001.  (Trial Tr. Vol. IV at 528:2-17, Nov. 27, 2017, Docket No. 763.)  He further testified that he worked for Schwendimann at NuCoat from 2013 to 2016.  (*Id.* at 528:4-5; 535:13-20.)

Galatowitsch testified that ACT began developing dark T-shirt transfer products in 1995 or 1996.  (*Id.* at 529:24-530:1.)  He testified that he worked on the proposed formulations in the research and development lab.  (*Id.* at 530:9-25.)  Galatowitsch described the basic structure of the dark T-shirt transfer product as (1) a silicone release paper coated with a resin layer, (2) an opacity layer, and (3) an ink-receptive layer.  (*Id.* at 531:10-16.)  Galatowitsch explained that the opacity layer – also described as a white layer – contained both titanium dioxide and polyurethane in the samples that were developed in 1995 or 1996.  (*Id.* at 531:17-22; 533:15-534:5.)  He also testified that the ink-receptive layer contained polyurethane in the samples that were developed in 1995 or 1996.  (*Id.* at 531:23-25; 533:15-534:5.)

Finally, Galatowitsch testified that NuCoat's 415 and 1654 products had the same structure as the product developed by ACT in 1996 and sold by ACT in 1999.  (*Id.* at 536:20-549:24.)

Galatowitsch's testimony establishes that ACT developed a dark T-shirt transfer product around 1996 that contained both (1) an ink-receiving layer containing polyurethane and (2) a white layer containing polyurethane. Additionally, his testimony establishes that NuCoat's 415 and 1654 products have the same structure as the products developed by ACT in 1996.

However, Galatowitsch's testimony must be further corroborated by uninterested witnesses or documentary evidence because he is an interested party. *See Finnigan*, 180 F.3d at 1367-68. The Court finds that Galatowitsch is an interested party because he is a former employee of NuCoat. *Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.*, 308 F.3d 1167, 1189 (Fed. Cir. 2002).

### d.      The Formula Book

"Mere testimony concerning invalidating activities is received with further skepticism because such activities are normally documented by tangible evidence such as devices, schematics, or other materials that typically accompany the inventive process." *Finnigan*, 180 F.3d at 1366. As corroboration, Schwendimann offered the formula book that was kept during the creation of ACT's dark T-shirt transfer product. (Myers Decl. ¶ 27; Trial Ex. P007 ("Formula Book").) The formula book is exactly the type of documentary evidence courts expect to corroborate witness testimony. *See Finnigan*, 180 F.3d at 1366.

The formula book corroborates the testimony that ACT developed a dark T-shirt transfer product in 1996 that had an ink-receptive layer containing polyurethane and a white layer containing polyurethane. Between June 12-21, 1996, ACT developed Sample

7158.  (Formula Book at 51-58.)  Step IV of Sample 7158 shows that ACT made a mixture of 100g B.F. Goodrich Polyurethane ("PU") and 100g titanium-oxide solution ("TIO2 sol."):



(*Id.* at 53.)  Schwendimann and Nasser both testified that steps III and IV of Sample 7158 illustrate the mixing of the white layer.  (Trial Tr. Vol. II at 120:24-122:2; Trial Tr. Vol. III at 388:13-389:21.)  Galatowitsch testified generally that dark T-shirt transfer product samples in 1995 and 1996 had a white layer that contained both titanium dioxide and polyurethane – as described by Sample 7158.  (Trial Tr. Vol. IV at 531:17-22.)  The Court therefore finds that the formula book corroborates the testimony of Schwendimann, Nasser, and Galatowitsch by demonstrating that ACT created a dark T-shirt transfer product with a white layer containing polyurethane in 1996.

Step VII of Sample 7158 shows that the sample contained an ink-receiving layer with polyurethane, consistent with the standard ink-receiving layer used by ACT in its light T-shirt transfer products:



(Formula Book at 53.) Schwendimann and Nasser testified that Sample 7158's ink-receiving layer included polyurethane and that the formula for the ink-receiving layer was based on ACT's standard formula ("our std formula") for ink-receptive layers. (Trial Tr. Vol. II at 120:8-15; Trial Tr. Vol. III at 390:1-15.) Galatowitsch testified generally that dark T-shirt transfer product samples in 1995 and 1996 had an ink-receptive layer that contained polyurethane – as described by Sample 7158. (Trial Tr. Vol. IV at 531:23-25.) The Court therefore finds that the formula book corroborates the testimony of Schwendimann, Nasser, and Galatowitsch that ACT created a dark T-shirt transfer product with an ink-receptive layer containing polyurethane in 1996.

Applying the rule of reason, the Court finds that the formula book is sufficient to corroborate the testimony of Schwendimann, Nasser, and Galatowitsch. *See Woodland Tr.*, 148 F.3d at 1371. The Court therefore concludes that a reasonable jury could have found by clear and convincing evidence that, in 1996, ACT invented a dark T-Shirt transfer product that satisfied all elements of claims 1 and 11 of the '093 Patent. *See* Fed. R. Civ. P. 50(a)(1).

## 2. On Sale

Second, the Court must consider whether Schwendimann's mid-1990s invention was sold or offered for sale at least one year before April 19, 2001. 35 U.S.C. § 102(b). The Court finds the following testimonial and documentary evidence relevant to its determination: (1) Schwendimann's testimony, (2) Nasser's testimony, (3) Galatowitsch's testimony, and (4) an August 9, 1999, contact report.

### a. Schwendimann's Testimony

Schwendimann testified that ACT began selling dark T-shirt transfer products to Wyndstone in 1999 and that Wyndstone wanted an exclusivity agreement for dark T-shirt transfer products. (Trial Tr. Vol. II at 159:15-19, 160:16-161:3.)

Schwendimann also testified that she tried to market the dark T-shirt transfer products to Avery Dennison in 1999. (*Id.* at 160:4-8.) She testified that she provided samples – approximately 50 sheets – of the dark T-shirt transfer product to Avery Dennison, but Avery Dennison never purchased dark T-shirt transfer products from ACT or Cooler Concepts. (*Id.* at 160:9-21.)

### b.      Nasser's Testimony

Nasser testified that Wyndstone approached ACT about its dark T-shirt transfer product because Wyndstone believed ACT's product was better than alternatives on the market. (Trial Tr. Vol. III at 427:18-428:5.) Moreover, he testified that ACT sold its dark T-shirt transfer products to Wyndstone. (*Id.* at 428:6-8.)

### c.      Galatowitsch's Testimony

Galatowitsch testified that the dark t-shirt transfer product that was first developed around 1996, was the one ultimately marketed by ACT in 1999. (Trial Tr. Vol. IV at 529:24-530:5; 534:6-17.)

### d.      Contact Report

Schwendimann submitted a Contact Report between Schwendimann and Wyndstone – the first customer for the dark T-shirt transfer product. (Myers Decl. ¶ 29, Trial Ex. P010 at 2.) One note on the Report is dated August 9, 1999, and states, "Dark Fabric Transfer – We will continue to test our options on this and continue with our trials."

(*Id.*)  An additional note from August 10, 1999, states, "We figured out the Dark Fabric Transfer and we will now set up the run.  They want 500 sheets."  (*Id.*)  Galatowitsch's testimony established that this product was the same one invented by Schwendimann around 1996, and the formula book further corroborates Galatowitsch's testimony.  The Court therefore finds that the Contact Report corroborates the testimony of Schwendimann and Nasser that ACT marketed the dark T-shirt transfer product to Wyndstone as early as August 9, 1999.

Applying the rule of reason, the Contact Report is sufficient evidence to corroborate the testimony of Schwendimann, Nasser, and Galatowitsch.  *See Woodland Tr.*, 148 F.3d at 1371.  The Court concludes that the jury could have reasonably found by clear and convincing evidence that ACT sold its dark T-shirt transfer product to Wyndstone sometime around August 9, 1999.

Because the Court finds that a reasonable jury could have found that Schwendimann and ACT invented a dark T-shirt transfer product with both an ink-receptive layer and a white layer containing polyurethane that was sold or offered for sale at least one year before April 19, 2001, the Court will deny AACI's motion for judgment as a matter of law on the invalidity of the '093 Patent.  *See* 35 U.S.C. § 102(b).

### 3.    Publicly Known

Third, the Court must consider whether Schwendimann's mid-1990s invention was publicly known before April 19, 2001. 35 U.S.C. § 102(a).

Schwendimann submitted evidence of her efforts to contact customers, demonstrating that she "did not attempt to keep information about the [invention] secret

and confidential from the public." *Bennett Regulator Guards, Inc. v. Canadian Meter Co.*, 184 F. App'x. 977, 981 (Fed Cir. 2006). Schwendimann testified that she provided samples of her product to potential customers. (Trial Tr. Vol. II at 160:9-21.) The Contact Report corroborates this testimony. (*See* Myers Decl. ¶ 29, Trial Ex. P010 at 2.) There is no evidence that Schwendimann sought to conceal the structure of her invention and, in fact, provided samples of the invention to potential customers. A jury could have, therefore, reasonably found by clear and convincing evidence that the product was publicly known before April 19, 2001.

Because a reasonable jury could have found that Schwendimann and ACT invented a dark T-shirt transfer product with both an ink-receptive layer and a white layer containing polyurethane that was publicly known before April 19, 2001, the Court will deny AACI's motion for judgment as a matter of law on the invalidity of the '093 Patent. 35 U.S.C. § 102(a).

**B.     '475 Patent and the '875 Patent**

AACI also argues that no reasonable jury could have found that the '475 Patent and/or the '875 Application anticipates the '093 Patent. (AACI's Mem. Supp. Invalidity JMOL at 20-23, Nov. 20, 2017, Docket No. 739.) Because the Court finds that a reasonable jury could have found the '093 Patent invalid as anticipated by Schwendimann's mid-1990s invention, the Court need not consider whether a reasonable jury could have found the '093 Patent anticipated by the '475 Patent and/or the '875 Application.

## III. NEW TRIAL

The Court must decide whether to grant AACI's motion for a new trial on the basis that the Court should have excluded evidence of (1) the '475 Patent as prior art and (2) copying. The Court will deny AACI's motion.

### A. Evidence of the '475 Patent

First, the Court concludes that it did not err in permitting evidence of the '475 Patent as prior art. AACI's argument merely revives an argument that the Court rejected pre-trial. (MILs Order at 12.)

Under § 102(e), a patent is anticipated if the invention was described in another patent granted on an application filed by another before the invention by the application for patent. 35 U.S.C. § 102(e). In short, "an applicant is not entitled to a patent if another's patent discloses the same invention." *In re Giacomini*, 612 F.3d 1380, 1383 (Fed. Cir. 2010). The earlier application must disclose the subject matter claimed in the subsequent application or resulting patent. *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008); *Kothmann v. Enters., Inc. v. Trinity Indus., Inc.*, 455 F. Supp. 2d 608, 637-38 (S.D. Tex. 2006). An applicant may not use an amendment, continuation, or divisional application to add new matter to an earlier application; a continuation-in-part application is an appropriate instrument for that purpose. *See* 35 U.S.C. § 132(a); 37 C.F.R. § 1.53(b)(2); *Kothmann*, 455 F. Supp. 2d at 637-40.

The '475 Patent stems from a longline of patent applications:

| | Number | Type of Application | Filing Date |
|---|---|---|---|
| 1 | 09/541'845 ("'845 Application") | Initial | April 3, 2000 |

| 2 | 10/911'249 Application | Divisional | August 4, 2004 |
| 3 | 12/034'932 Application | Continuation | February 21, 2008 |
| 4 | 12/193'562 Application | Continuation | August 18, 2008 |
| 5 | U.S. Patent 7'766'475 ("'475 Patent") | | |

(Myers Decl. ¶ 24; Trial Ex. P003 at 2.)   The Court previously concluded that the applications resulting in the '475 Patent disclose the same matter as its parent applications. (MILs Order at 12.)   All of the applications between the '845 Application and the '475 Patent were filed and approved as divisions or continuations, which means that the U.S. Patent and Trade Mark Office ("USPTO") did not believe that these applications added new matter.  *See* 35 U.S.C. § 132(a); 37 C.F.R. § 1.53(b)(2); *Kothmann*, 475 F. Supp. 2d at 638.   If these applications had added new matter, the USPTO likely would have designated these applications as "continuation-in-part."

The '475 Patent was relevant as evidence of prior art.  *See* Fed. R. Evid. 401, 402. The probative value of the '475 Patent was not substantially outweighed by any unfairly prejudicial effect or risk of confusing the issues or misleading the jury.  *See* Fed. R. Evid. 403.

AACI seeks to use its motion for a new trial as a time machine.  In essence, AACI argues that, because it was entitled to judgment as a matter of law with respect to anticipation by the '845 Application and/or the '475 Patent, the '475 Patent was irrelevant and should not have been admitted.  But courts regularly admit evidence relevant to a particular issue and then resolve that particular issue after the close of the plaintiff's case in chief.  (*E.g.*, Trial Tr. Vol. IX at 1917:2-23 (granting AACI judgment as a matter of law

on the lost-profits issue).)  Indeed, how else could a court decide a Rule 50(a) motion without considering the evidence admitted?  The mere fact that a court resolved the issue does not make the admission of evidence on that issue erroneous.  By AACI's argument, a Court **always** errs when it admits evidence on issues that it ultimately resolves on a Rule 50(a) motion.  AACI's argument is nothing more than a repetition of its judgment-as-a-matter-of-law argument, which the Court need not consider on this motion.

Accordingly, the Court concludes that it did not err in admitting evidence of the '475 Patent as prior art because this evidence was relevant and not unfairly prejudicial.

Moreover, even if the Court erred in admitting evidence of the '475 Patent, the Court cannot conclude that this alleged error would have "resulted in a miscarriage of justice." *Gray*, 86 F.3d at 1480.  The jury also concluded that the '093 Patent was invalid because it was anticipated by Schwendimann's mid-1990s invention.  Even if the Court had excluded the '475 Patent, the jury would have found the '093 Patent invalid under § 102(a) and (b).

### B.    Evidence of Copying

Second and finally, the Court concludes that – even if it erred in admitting evidence of copying – the evidence of copying did not have a substantial influence on the jury's invalidity determination.  *Littleton*, 562 F.3d at 888.  AACI's sole argument on this point is that the evidence of copying was inflammatory and, therefore, tainted the jury's determination of invalidity.  *Cf. Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 889-90 (8th Cir. 1998).  The Court disagrees.  Schwendimann's evidence of copying was not inflammatory because it was relevant to the issues of willful infringement and non-

obviousness. Moreover, the jury's finding of invalidity – at least with respect to Schwendimann's invention in the mid-1990s – was supported by substantial evidence. The Court therefore concludes that the evidence of copying did not have a substantial influence on the jury's invalidity determination.[2]

Accordingly, the Court will deny AACI's motion for a new trial on invalidity of the '093 Patent.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that AACI's Renewed Motion for Judgment as a Matter of Law or, In the Alternative, a New Trial on Invalidity of the '093 Patent [Docket No. 737] is **DENIED**.

DATED: July 30, 2018              _____s/John R. Tunheim_____
at Minneapolis, Minnesota.            JOHN R. TUNHEIM
                                          Chief Judge
                         United States District Court

---

[2] The Court is not deciding in this Order whether the evidence of copying should have been excluded because Schwendimann allegedly failed to comply with Federal Rule of Civil Procedure 37(c)(1). The Court will decide that issue in its order reconsidering the willful-infringement issue. (*See* AACI's Renewed Mot. for J. as a Matter of L. on Willful Infringement, Nov. 20, 2017, Docket No. 734.) In this Order, the Court is concluding only that the evidence of copying had no substantial influence with respect to the **invalidity** issue.